**In re Robert Edward LITWILLER and Carol Kay Litwiller, Debtors.**

**Larry S. Eide, Trustee, Plaintiff,**

**v.**

**William Wollesen; Kristi Wollesen; William Wollesen and Kristi Wollesen as Trustees of the William and Kristi Wollesen Revocable Trust; ByRite Farm Supply Co., Inc.; Greystone, Inc.; Glenn Litwiller, and Ethel P. Litwiller, Defendants.**

Bankruptcy No. 01–03520F.
Adversary No. 03–9209F.

United States Bankruptcy Court, N.D. Iowa.

Dec. 19, 2006.

Jerrold Wanek, Des Moines, IA, for Debtors.

Larry S. Eide, Mason City, IA, pro se.

Joseph E. Halbur, Carroll, IA, Robert Kohorst, Harlan, IA, for Defendants.

### MEMORANDUM DECISION RE COMPLAINT

WILLIAM L. EDMONDS, Chief Judge.

The matter before the court is the final trial of the trustee's complaint to determine the validity, priority or extent of liens and interests in certain property. He also objects to certain claims. Trial was held May 10, 2006 in Fort Dodge. Plaintiff Larry S. Eide appeared on his own behalf. Defendants Glenn Litwiller and Ethel Litwiller were represented by Robert Kohorst. Joseph E. Halbur appeared for defendants William Wollesen, Kristi Wollesen, William Wollesen and Kristi Wollesen as trustees of the William and Kristi Wollesen Revocable Trust Dated April 1, 1998, ByRite Farm Supply, Inc.[1], and Greystone, Inc. (collectively "Wollesens"). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) and (K).

### Findings of Fact

In January 2000, debtors Robert Litwiller and Carolyn Litwiller owned about 446 acres of farmland in Section 30 of Bellville Township, Pocahontas County, Iowa (the "Farm"). They also had agreements to lease additional Pocahontas County farmland in 2000 from other owners.

Litwillers were in serious financial difficulty at the time. They owed mortgage debt of approximately $600,000 to First Bank & Trust Company, Lohrville, Iowa ("Bank"). They were also delinquent on operating loans for 1998 and 1999 owed to Pro Cooperative ("Pro Co-op") in the principal amount of about $170,000.

In early January 2000, Robert Litwiller contacted William Wollesen by telephone to discuss leasing his farmland to Wollesen. Litwiller expressed a desire to receive cash rent as soon as possible. The two men reached an oral agreement to lease all of Litwillers' farms for the 2000 crop year, a total of approximately 767 acres, to Wollesens for $112,000 cash rent. Wollesens paid this amount by check dated January 11, 2000.

Between November 30, 1999 and June 13, 2000, the United States Department of Agriculture, Commodity Credit Corporation, now known as the Farm Service Agency, issued five checks jointly payable to Robert Litwiller and Pro Co-op (the "FSA checks"). The FSA checks, in the aggregate amount of $13,524, represented advance farm program payments respecting farm land that had been leased to Wollesens.

Wollesens first learned of the FSA payments in the spring of 2000 when they attempted to enroll the leased acres in the farm program under their own names. They were advised by FSA that Litwillers were the operators of record and that the advance payments would have to be repaid

---

1. Defendant ByRite Farm Supply, Inc. is a corporation controlled by William Wollesen and Kristi Wollesen. The court will use the spelling of the corporation's name as shown in Wollesen's Exhibit 106.

before Wollesens could sign up for the program.

William Wollesen discussed the matter with Robert Litwiller, who said that he did not have the funds available to repay FSA. Litwillers had not yet cashed the checks, but because they were made jointly payable to Pro Co-op, Litwillers did not have exclusive control over returning them to FSA. Litwiller said that if he could pay down his debt to the Bank and get equipment released from the Bank's lien, he could then sell the equipment and repay FSA. On or about May 3, 2000, Wollesen wrote a check for $25,000 payable to Robert Litwiller to permit the repayment to FSA. Litwillers did not repay the farm program payments to FSA. The FSA checks were not cashed and remain in the possession of plaintiff Larry Eide, Litwillers' Chapter 7 trustee.

Wollesens had expected that their rights under the lease would include the right to receive the farm program payments respecting the land. In the summer of 2000, apparently after the deadline for changing the operator of record for that year with FSA, William Wollesen attempted to change the lease. There was some discussion that Greystone, Inc., a corporation owned by William Wollesen's father, would lease the Farm from Litwillers for the 2000 crop year for $67,200 cash rent. On or about July 25, 2000, a lease document was prepared according to these terms, but it was not signed. William Wollesen's father did not want to enter into the agreement.

William Wollesen said that at about this time he and Robert Litwiller discussed changing the transaction from a lease to a custom farming contract so that Wollesens would be custom operators rather than tenants. Litwillers deny that the lease was changed to a custom farming arrangement. On July 28, 2000, a financing state-

ment was filed with the Iowa Secretary of State naming ByRite Farm Supply, Inc. as the secured party and Robert Litwiller as the sole debtor. The financing statement purported to cover—

All crops, whether annual or perinnial [sic] and the products thereof and all seed, fertilizer and other supplies used in borrowers [sic] farming operation.

Exhibit 106. Five parcels of real property covered by the financing statement were described on an attachment dated March 1, 2000 and signed only by Robert Litwiller. The property described may not be identical to the property subject to the oral lease. *See* Exhibit 121 (letter from Wollesens' counsel dated February 15, 2001). No security agreement between ByRite and Robert Litwiller was introduced into evidence. The court finds that the parties did not execute a security agreement in connection with filing the financing statement. Wollesens did not do a lien search prior to filing the financing statement.

On October 11, 2000, Pro Co-op obtained judgment against Litwillers in the Iowa District Court for Pocahontas County, Equity No. 125183. Judgment was in the principal amount of $169,925.00, plus accrued interest as of August 8, 2000 in the amount of $41,771.79, plus interest on the principal balance from and after that date at the rate of ten percent.

During harvest in mid-October 2000, Wollesens learned that the crop from the property leased from Litwillers would be subject to a lien by Pro Co-op if the corn was the property of Litwillers.

On November 3, 2000, Wollesens and Litwillers executed a document titled "Real Estate Contract (Short Form)" (the "Contract"). Exhibit 103. The Contract, which was prepared by Wollesens' attorney James R. Van Dyke, stated that

Litwillers as Sellers agreed to sell and Wollesens as Buyers agreed to buy approximately 446 acres of real estate in Pocahontas County. This property was the Farm owned by Litwillers that was subject to Bank's mortgage and Pro Co-op's judgment lien. The sale price was described as follows:

1. PRICE. The total purchase price for the Real Estate is nine hundred ninety-two thousand, two hundred dollars ($915,200.00) [2] (sic) of which [see below] has been paid. Buyers shall pay the balance to Sellers at Pomeroy, Iowa, or as directed by Sellers, as follows:

(a) in the event Sellers comply with the conditions set forth herein, this Contract will be canceled and the real estate will revert to Sellers subject to a three-year lease (starting March 1, 2001) at $160 per tillable acre (416 tillable acres) per year, payable March 1, 2001 and each March 1 thereafter during the term of the lease, with an option in favor of Buyer to rent for an additional 2 years.

(b) The conditions that will lead to cancellation are that Seller will pay to Buyer the following:

(1) the $25,000.00 rental advance toward possible 2001 rent (or down payment advance) already paid by Buyer to Seller, plus 11.5% interest from the date of said advance which was May 10, 2000, said amount plus interest to be paid not later than March 1, 2001.

(2) an amount exactly equal to 100% of the year 2000 corn crop proceeds [except for Ronald Litwiler's (sic) half of the corn from the 80 acres cropshare rented by Sellers from Ronald Litwiler (sic)], said amount to be paid immediately (within 24 hours) of the deposit of the said corn crop proceeds by Sellers.

(3) an amount exactly equal to 100% of the year 2000 LDP proceeds to be received by Sellers on all land on which Buyers or William or Kristi Wollesen individually, were custom farmers or lenders for crop inputs in 2000; said amount to be paid immediately (within 24 hours of the receipt of the said LDP proceeds by Sellers).

(4) the amount of $30,982.75, plus interest at the rate of 11.5% from November 1, 2000. Said amount plus interest at 11.5% from November 1, 2000, is to be paid not later than March 1, 2001.

(5) any additional government program proceeds that may be received by Sellers from the year 2000 program, to be paid to Buyers immediately (within 24 hours of receipt).

(6) reimbursement to Buyers for title opinions of $375.00 and abstracting costs of $523.75, to be paid with interest at 11.5% from date paid by Buyers, said reimbursement not later than December 1, 2000.

(7) reimbursement to Buyers for crop expenses advanced in the amount of $4,552.99, plus interest at the rate of 11.5% from July 1, 2000, said amount plus interest to be paid not later than March 1, 2001.

(8) reimbursement to Buyers for tillage on 151.6 acres and 122.3 acres @ $20 per acre or a total of $5,478.00 plus interest at 11.5% from November 15, 2000, said amount plus interest to be paid not later than March 1, 2001.*

(c) The amounts calculated according to paragraphs 1, 4, 5, 6, 7 and 8* above, if paid on or before the due dates specified, will be applied to cash rent for the land for the year 2001. If any or all of the amounts in paragraphs 1 through 8

---

2. William Wollesen said that the purchase price was $915,200.00 and that the price of "nine hundred ninety-two thousand, two hundred dollars" is incorrect.

are not paid in full by the due dates specified, then all the amounts calculated according to paragraphs 1 through 8 will be credited to the down payment.

*reimbursement for tillage is due only if Sellers do not rent either or both the 151.6 crop acre farm or the 122.3 crop acre farm for the crop year 2001.

The balance shall be paid with interest annually on or before March 1 of each year beginning March 1, 2002, in level payments on a 25-year amortization schedule; however, Buyers may prepay the entire unpaid balance by March 1, 2001, after deducting all the amounts set forth immediately above, and only in the event Sellers have not performed all the above conditions which, as stated, will result in cancellation of this contract.

In the event Sellers contest this contract or breach it in any respect, Sellers shall pay Buyers' attorney fees and costs in the form of a reduction of contract principal equal to the amount of such attorney fees and costs.

Exhibit 103. The unpaid balance of the purchase price under the Contract would accrue interest at the rate of 7.5%. *Id.* at ¶ 2.

■ Appraiser Rowland Burton valued the Farm as of April 12, 2006 at $1,476,000. Using the 2006 appraisal and the Iowa Land Value Survey, Burton estimated that the value of the Farm as of November 3, 2000 was $968,000. Wollesens contend that the historic valuation should be reduced by about $86,000 to account for grain bins that were placed on the property after 2000. The court takes judicial notice that in a May 2002 hearing on Litwillers' homestead exemption claim, a Bank loan officer estimated the value of the Farm at $1.2 million. *In re Litwiller*, No. 01–03520F, slip op. at 3 (Bankr. N.D.Iowa July 2, 2002) (Doc. 55). The court concludes that a finding of the value

of the Farm as of November 3, 2000 is not essential to this decision.

William Wollesen attempted at trial to identify the items making up the down payment under the Contract. The "$25,-000.00 rental advance" in paragraph (b)(1) was the amount Wollesens loaned Litwillers in May 2000 to permit repayment of the FSA advances. There was no evidence to show whether Litwillers received the property referenced in paragraph (b)(3), LDP payments for 2000, or paragraph (b)(5), any additional government payments for the 2000 farm program. Although Wollesens obtained a title opinion and had the abstract updated, as evidenced by paragraph (b)(6), a groundwater hazard statement was not prepared for the transaction evidenced by the Contract. Item (b)(7), $4,552.99 for crop expenses incurred July 1, 2000, is apparently half of the amount claimed due for inputs on a farm owned by Ronald Litwiller. *See* Claim No. 22, Invoice No.1904. Paragraph (b)(8) refers to "tillage on 151.6 acres and 122.3 acres." These acres are not included in the 446 acres that are the subject of the Contract. They are the tillable acres on two additional farms Wollesens had subleased from Litwillers.

Item (b)(4), "the amount of $30,982.75, plus interest at the rate of 11.5% from November 1, 2000," was not adequately identified. Wollesens suggested that item (b)(4) was a duplicate of item (b)(1) with accrued interest, but as Eide pointed out in his post-trial brief, this explanation would require an interest rate of about 48%. Doc. 88 at 19. One would think, comparing item (b)(4) to item (b)(1), that the amount of $30,982.75 was advanced by Wollesens on November 1, 2000; however, no one said that such amount was advanced. The court concludes that the failure to identify this item does not affect the outcome of the decision.

On November 3, 2000, the same date that the Contract was executed, Litwillers as landlords and Wollesens as tenants executed lease forms for lease of three farms beginning March 1, 2001. Two of the leases were for the farms not owned by Litwillers but subleased from them. Exhibit 101 relates to 122.3 tillable acres in Section 34 in Bellville Township, Pocahontas County; Exhibit 102 is a lease for 151.6 tillable acres in Section 19 of the same township. Exhibit 100 is the lease for the 416 tillable acres of the approximately 446 acres then owned by Litwillers. Paragraph 19 of the lease form referred to "attached Additional Provisions." The last page of the lease document contained the following list:

### ADDITIONAL CONSIDERATIONS

(1) the $25,000.00 rental advance toward possible 2001 rent was already paid by Tenant to Landlord, and will be credited toward rent for 2001 or later years, plus 11.5% interest from the date of said advance which was May 10, 2000.

(2) the amount of $30,982.75, plus interest at the rate of 11.5% from November 1, 2000 is also to be credited toward rent for 2001 or later years.

(3) any additional government program proceeds that may be received by Landlord after October 19, 2000, from the year 2000 program are to be credited toward the rent for 2001 or later years.

(4) reimbursement to Tenants for title opinions of $375.00 and abstracting costs of $523.75, with interest at 11.5% from date paid by Tenants, to be credited toward Tenants' rent for 2001 or later years.

(5) reimbursement to Tenants for crop expenses advanced in the amount of $4,552.99, plus interest at the rate of 11.5% from July 1, 2000, said amount plus interest to be credited toward Tenants' rent for 2001 or later years.

(6) reimbursement to Tenants for tillage on 151.6 acres and 122.3 acres @ $20 per acre or a total of $5,478.00 plus interest at 11.5% from November 15, 2000, said amount to be credited toward Tenants' rent for 2001 or later years.*

*reimbursement for tillage is due only if Landlords do not rent either or both the 151.6 crop acre farm or the 122.3 crop acre farm for the crop year 2001. Exhibit 100.

Also on November 3, 2000, Glenn and Ethel Litwiller, the parents of Robert Litwiller, assigned their rights in a September 1999 mortgage in the 446 acres to Wollesens for no consideration (the "Assignment"). On November 9, the Contract and Assignment were filed with the office of the Pocahontas County Recorder. Exhibits 103, 112.

One of the real estate parcels farmed by Wollesens in 2000 was owned by the Nelles Trust. The fall installment of rent owing on the Nelles Trust property was unpaid on November 9, 2000. Litwillers confessed judgment for $5,740 in favor of Wollesens. On November 9, 2000, the Confession of Judgment was filed in the Iowa District Court for Pocahontas County, Case No. TJTJ 125009. Sometime between February 7 and July 3, 2001, this debt was satisfied from the 2000 corn crop. *See* Exhibits C, D.

Wollesens delivered the harvested corn to NEW Cooperative ("NEW Co-op") at locations in Pocahontas and Calhoun Counties. Most of the grain from the farms leased from Litwillers was delivered to NEW Co-op from October 11 through October 17, 2000. Grain settlement sheets were issued in the name of Bill and Kris Wollesen. At some point Wollesens attempted to transfer the corn to the name of Robert Litwiller. By November 6,

2000, NEW Co-op was aware of a claim by Pro Co-op to grain coming from the Litwiller farms. Because of competing claims to the crops, NEW Co-op stored the grain and, on November 17, 2006, issued warehouse receipts in the name of Bill and Kris Wollesen. Warehouse receipt 44694 was issued for 9,844.89 net bushels of corn delivered to Palmer, Iowa. Warehouse receipt 44695 was issued for 121,361.13 net bushels of corn delivered to Pomeroy, Iowa. Exhibit B. By letter dated February 7, 2001, NEW Co-op advised Wollesens and Litwillers that the grain had been warehoused and that the Co-op had "decided to let the courts figure out what grain belongs to who." Exhibits B, C.

On February 16, 2001, Pro Co-op filed a petition for declaratory judgment in the Iowa District Court for Pocahontas County, Equity No. 307716, to resolve the competing claims to the warehoused crop. In approximately August 2001, Wollesens purchased Pro Co-op's rights against Litwillers. The grain was still being warehoused when Litwillers filed a voluntary Chapter 7 petition on October 16, 2001. Post-petition efforts were made to have the grain sold. *See* Exhibits E, G. On or about January 6, 2005, the 2000 crop was sold. Storage charges totaling $192,969.09 were subtracted from the gross sale price. NEW Co-op issued a check in the amount of $11,296.62 payable to Bill & Kris Wollesen. Exhibit K.

On May 11, 2001, Bank filed an action in the Iowa District Court for Pocahontas County to foreclose its mortgages on the Farm. Litwillers were named defendants in the action as mortgagors of the property; Pro Co-op and Farm Credit Leasing Services Corporation were so named as judgment creditors. Wollesens were defendants in the proceedings by virtue of the recorded Contract, the recorded mortgage Assignment from Glenn and Ethel Litwiller, and the November 9, 2000 confession of judgment and additionally, on August 16, 2001, as purchasers of Pro Co-op's rights against Litwillers. On September 13, 2001, the Iowa District Court rendered judgment *in rem* in favor of Bank in the amount of $756,605.56 plus interest and costs, and a decree of foreclosure against the Farm. The court's findings of fact included the following statement:

> The interest of Defendants, William S. Wollesen and Kristi J. Wollesen, William and Kristi Revocable Trust dated April 1, 1998, and Farm Credit Leasing Services Corporation, are that of a[sic] lien holders, whose liens are junior and inferior to the lien of Plaintiff's Mortgage.

Exhibit 121, Decree of Foreclosure at 5.

The sheriff's sale of the Farm was held March 6, 2002. Bank, as the successful bidder at the sale, obtained a sheriff's certificate of purchase of the Farm. On June 28, 2002, Wollesens paid $808,035.10 directly to Bank for assignment of the sheriff's certificate of purchase. On July 12, 2002, Wollesens filed an Affidavit of Indebtedness Owed to Redeeming Creditor pursuant to Iowa Code § 628.18. The affidavit identified Wollesens as "assignees of the judgment lien and other claims held by Pro Cooperative." Exhibit 110, ¶ 3. The affidavit stated:

> As of June 28, 2002, the indebtedness owed to the Wollesens as assignee of Pro Cooperative pursuant to the judgment entered on October 11, 2000 in Case No. EQCV 125183 was $243,726.49, with per diem interest accruing thereafter in the amount of $46.5548.

*Id.,* ¶ 9. The affidavit set out the calculation of the amount of indebtedness based on Pro Co-op's judgment plus interest through June 28, 2002.

The decree of foreclosure originally established a six-month redemption period. Wollesens expected that they would re-

ceive a sheriff's deed on September 6, 2002. By order of September 5, the Iowa District Court for Pocahontas County stayed running of the decretal redemption period pending further hearing. The court recognized that a remaining issue was "the effect of the equitable conversion" arising from Wollesens' Contract; this issue was not resolved in state court. On September 17, the Iowa District Court determined that Wollesens' redemption was valid and modified the decree to provide for a one-year redemption period. The court further ordered: "Any right of redemption held by the Litwillers or Eide, as bankruptcy trustee, shall expire on March 5, 2003, pursuant to Iowa Code section 628.3."

On December 16, 2002, more than nine months after the date of the sheriff's sale, Wollesens filed an Affidavit and Notice of Credit on Lien pursuant to Iowa Code § 628.19 stating that they were willing to credit the debtors in the amount of $875,000. The one-year redemption period expired with no further redemptions. On March 12, 2003, Wollesens received a sheriff's deed to the Farm.

Litwillers filed their Chapter 7 bankruptcy petition on October 16, 2001. No receiver was appointed in Bank's foreclosure action filed May 11, 2001. The stay was lifted in the case to permit Bank to complete the sheriff's sale of the Farm.

At the time of the bankruptcy filing, Wollesens were farming Litwillers' farmland including the Farm. They did not make rent payments for 2001. Chapter 7 trustee Eide demanded from Wollesens $67,200 for rent due March 1, 2002. In April 2002, Wollesens paid $60,320 to the trustee with the notation "contract payment" on the check.

On February 28, 2002, a claim for $225,000 was filed in the name of Glenn and Ethel Litwiller ("Claim No. 12"). The proof of claim form was not signed. The form indicated that the claim was secured by real estate, but there were no documents of explanation filed with the claim form. Glenn and Ethel Litwiller did not file Claim No. 12.

On April 30, 2002, Wollesens filed three claims. A claim for $223,167.58, designated Claim No. 21 by the clerk of court, was filed in the name of "Bill & Kris Wollesen and/or William & Kristi Wollesen Revocable Trust As Assignees of Pro Cooperative." The Wollesens claimed that this debt was secured by the FSA checks in the possession of Eide, the 2000 corn crop and other property.

Claim No. 22 was filed by ByRite Farm Supply, a corporation owned by Wollesens. The claim for $123,798.06 indicated it was for 2000 crop inputs and was secured by the crop. The amount of the claim was the sum of two invoices plus interest at the rate of 12.5% to the date of the bankruptcy filing. The first invoice, unnumbered but dated April 20, 2000, was in the amount of $96,495.77 for fertilizer and herbicide on 730.6 acres and 280 bags of seed corn. The second invoice, also for fertilizer, herbicide and seed corn, was invoice No.1904 dated July 25, 2000, in the amount of $9,105.98. The latter invoice, addressed to Robert Litwiller and his brother Ronald, was for inputs on a farm owned by Ronald Litwiller. Robert had leased the farm from Ronald for a fifty percent share of the crop with the agreement that each would pay fifty percent of the crop input expenses.

Wollesens also filed Claim No. 23 in the amount of $206,952.49. This sum was the total of three figures: the $112,000 rent payment made January 11, 2000, described as "monies loaned;" the $25,000 loan made May 3, 2000 to permit repayment of the FSA checks; and about $61,500 plus inter-

est for labor to plant, cultivate and harvest crops on the farms leased from Litwillers. Invoice No. 305, dated June 20, 2000, and invoice No. 306, dated November 1, 2000, were for farm labor on 767.3 acres. Invoice No. 307, dated November 1, 2000, was for labor on the farm owned by Ronald Litwiller. Robert and Carolyn Litwiller said that in 2000 they received none of the invoices attached to Claim Nos. 22 and 23.

### Discussion

Eide as Chapter 7 trustee filed his complaint October 1, 2003 to determine the respective rights of the parties in the five FSA checks in his possession, approximately 126,354.36 bushels of corn in storage at NEW Co-op, and funds in the amount of $60,320 received from Wollesens in April 2002. The corn has since been sold and Wollesens received the proceeds. Eide now takes the position that the corn proceeds belong to Wollesens. Therefore, the remaining items of property in dispute are the FSA checks and the funds in the amount of $60,320. The trustee also objects to the allowance of Claim Nos. 12, 21, 22, and 23.

Resolution of this matter depends largely upon the nature of two transactions between Wollesens and Litwillers. The first issues are (1) whether in 2000 Wollesens were farming the farmland at issue under a lease or a custom farming arrangement and (2) whether the November 3, 2000 Contract effected a sale of the Farm to Wollesens prior to the date of Litwillers' bankruptcy petition.

### Lease or Custom Farming Arrangement

█ Even though the agreement was never committed to writing, there is no dispute that in January 2000 Wollesens agreed to lease Litwillers' farmland. The payment of $112,000 on January 11, 2000 was for 2000 rent. There are no documents expressly evidencing an agreement to change the terms of Wollesens' use of the farmland. William Wollesen said his discussions with Robert Litwiller about changing the lease to a custom farming contract took place in late July 2000. One of the invoices attached to ByRite's claim for crop inputs, Claim No. 22, is dated April 20, 2000. Litwillers denied receiving either of the invoices from ByRite or the invoices for labor attached to Wollesens' Claim No. 23.

█ ByRite obtained a financing statement from Robert Litwiller, Exhibit 106, but there is no underlying security agreement. Litwillers would have had to sign a security agreement in order for a security interest to attach in favor of ByRite. *See* Iowa Code § 554.9203 (2000); *Forker v. Duenow Mgmt. Corp.*, 227 B.R. 153, 160 (8th Cir. BAP 1998) (proof of existence of security agreement requires affirmative evidence). The Form UCC–1 itself did not create a security interest. Wollesens undoubtedly wanted to secure repayment of debt, but the financing statement is ambiguous as to what debt was being secured. There is no dispute that Wollesens' payment of $25,000 in May was a loan, but the financing statement does not show an agreement to change the $112,000 rent payment into a loan. The court concludes that Wollesens farmed Litwillers' farmland in 2000 under a lease.

█ As tenants under a lease, Wollesens owned the corn crop at issue. They are entitled to the proceeds of the crop evidenced by the check from NEW Co-op. Exhibit K. Moreover, Wollesens as tenants were liable for their own inputs and labor for farming Litwillers' land in 2000. Claim No. 22 for crop inputs provided by ByRite should be disallowed in its entirety. The amounts included in Claim No. 23 for farm labor and repayment of rent should be disallowed.

*November 3, 2000 Contract*

Eide contends that the Contract was an equitable mortgage. A transaction involving the transfer of real property may be deemed a mortgage if it is shown by clear and convincing evidence that the instrument was intended as security for debt. *Steckelberg v. Randolph,* 404 N.W.2d 144, 148 (Iowa 1987); *Greene v. Bride & Son Construction Co.,* 252 Iowa 220, 226–27, 106 N.W.2d 603, 607–08 (1960). In order for a deed or real estate contract to be deemed a mortgage, the party asserting an equitable mortgage must show "(1) That the consideration for the [instrument] was an existing indebtedness, together with the amount of such indebtedness; and (2) that such indebtedness was not extinguished by the conveyance, but was kept alive." *Steckelberg v. Randolph,* 404 N.W.2d at 148; *Greene v. Bride & Son,* 252 Iowa at 224, 106 N.W.2d at 606.

Other factors may support the finding of an equitable mortgage. "[T]he execution and delivery of an option to repurchase, the unavailability of legal advice for the grantor, and financial hardship as an inducement to the grantor in entering the agreement, all constitute classic circumstances pointing to a debtor-creditor relationship." *Steckelberg v. Randolph,* 404 N.W.2d at 149. Iowa courts are reluctant to construe an agreement that continues a debtor-creditor relationship as an absolute conveyance. If it is unclear what the parties intended, the court should "resolve the doubt in favor of an equitable mortgage." *Id.; see also Greene v. Bride & Son,* 252 Iowa at 226–27, 106 N.W.2d at 607 ("absolute deed accompanied by a contract to reconvey on specified conditions . . . will be construed to be a mortgage rather than a privilege to repurchase or a conditional sale"); *Cullen v. Butterfield,* 178 Iowa 621, 160 N.W. 125, 129 (1916) ("If

there be doubt on the question, courts almost universally hold that the transaction should be construed to be a mortgage, and not a conditional sale.")

The facts of this case show that the Contract between Litwillers and Wollesens should be deemed a mortgage. Litwillers were in a desperate financial situation at the time of entering into the Contract, and their situation was an inducement to enter into the agreement. There was no contemporaneous exchange of consideration for the Contract. The down payment under the Contract was described in a list of existing debts and obligations. The Contract was subject to cancellation if Litwillers as Sellers repaid the down payment. Litwillers did not have separate counsel during the negotiation and execution of the documents.

The parties executed the Contract on the same date that they executed a lease of the same property. Under the lease, nearly all the debts and obligations making up the down payment under the Contract were to be credited toward rent of the Farm for 2001. Exhibit 100, attachment. Therefore, contrary to paragraph (1)(b) of the Contract, cancellation of the Contract would not necessarily require repayment of the entire down payment. It appears that the parties' intent was for Wollesens to rent Litwillers' farmland in 2001. The Contract seems designed to secure the repayment of existing debt and the receipt of what Wollesens would have been entitled to receive if the 2000 farm lease had been performed conventionally, that is, the crop and government payments.

An equitable mortgage in the form of a conditional sale does not become a sale upon the grantor's failure to perform the condition. "If the transaction was a loan in the first instance, it will be treated as such to the end, unless it be shown that the parties afterwards bar-

gained for the property independently of the loan." *Greene v. Bride & Son*, 252 Iowa at 224, 106 N.W.2d at 606; *see also Richardson v. Barrick*, 16 Iowa 407, 1864 WL 206 at *2 ("it is a universal rule in equity that once a mortgage, always a mortgage"). Litwillers' failure to make the payments due March 1, 2001, did not effect a transfer of the equitable title to Wollesens. Litwillers retained redemption rights in the property which were not foreclosed. *Cullen v. Butterfield*, 178 Iowa 621, 160 N.W. at 129; *Fort v. Colby*, 165 Iowa 95, 144 N.W. 393, 403 (1913) ("the equitable right of redemption after default is preserved, remains in full force, and will be protected and enforced by a court of equity"); *Richardson v. Barrick*, 16 Iowa 407, 1864 WL 206 at *2 ("the equity of redemption is inseparable from [a mortgage], and every attempt to limit or defeat that right must fail").

■ The determination of the parties' respective rights in the property was subsumed by Bank's foreclosure action filed in May 2001. When Litwillers filed their bankruptcy petition on October 16, 2001, all their legal and equitable interests in property became property of their bankruptcy estate. 11 U.S.C. § 541(a)(1). No receiver was appointed in the foreclosure proceedings. Litwillers' redemption rights were not extinguished until March 2003. In the spring of 2002, Litwillers still held equitable title to the Farm, and the trustee was entitled to collect rent from Wollesens. The $60,320 being held by the trustee belongs to the estate.

■ Although Wollesens farmed Litwillers' farmland in 2001, they did not make rent payments that year. The Contract and farm lease for 2001, Exhibit 100, contemplated that certain advances, including the May 2000 loan of $25,000, would be treated as advance payment of farm rent. The $25,000 loan should be deemed credited toward 2001 rent, and its allowance as part of Claim No. 23 should be denied. The remainder of Claim No. 23 is not the debt of Litwillers' as discussed above. Therefore, Claim No. 23 should be disallowed in its entirety.

■ On December 16, 2002, Wollesens filed an affidavit under Iowa Code § 628.19, crediting debtors with $875,000. They had paid Bank the funds needed to redeem on June 28, 2002. Under Chapter 628 of the Iowa Code, it appears that a redemptor is expected to file an affidavit pursuant to § 628.18 and § 628.19 at substantially the same time that the funds to redeem are deposited with the clerk. *See* Lee B. Blum, *Iowa Statutory Redemption after Mortgage Foreclosure*, 35 Iowa L.Rev. 72, 75 (1949) (describing method of redemption); *Eliason v. Stephens*, 216 Iowa 601, 246 N.W. 771, 775 (1933) (same under 1931 Code). Wollesens expressed an intent in September 2002 to take the property in satisfaction of the claim acquired from Pro Co-op. The period for redemption by creditors expired nine months after the sheriff's sale on December 6, 2002. Iowa Code § 628.5. Statutory redemption must be exercised "within the period, and in the manner, prescribed by the statute creating it." *Central State Bank v. Lord*, 204 Iowa 439, 215 N.W. 716, 718 (1927). Wollesens' filing on December 16, 2002 was too late.

"[T]he redeeming creditor's lien, and the claim out of which it arose, will be held to be extinguished, unless the redeeming creditor pursues the course pointed out in sections 628.18 to 628.20, inclusive." Iowa Code § 628.17. Wollesens' claim based on rights acquired from Pro Co-op was extinguished for failure to file a timely affidavit pursuant to 628.19. They are held to have taken the property in satisfaction of their claim. *Meredith, Dickey & Co. v. Peterson*, 108 Iowa 551, 79 N.W. 351, 352 (1899). Therefore, Claim No. 21 should be disal-

lowed in its entirety. Moreover, because there is no underlying Pro Co-op debt to encumber them, the FSA checks are property of the estate free of any interests of the defendants.

Claim No. 12, filed in the name of Glenn and Ethel Litwiller for $225,000, should be denied in its entirety. Litwillers deny having filed it, and the proof of claim form was not signed. Rule 3001(b).

IT IS ORDERED that the corn proceeds represented by NEW Cooperative check No. 218429 in the amount of $11,296.62 are the property of William Wollesen and Kristi Wollesen, free of any interests of plaintiff-trustee Eide or Litwillers.

IT IS FURTHER ORDERED that the FSA checks in the aggregate amount of $13,524 and funds in the amount of $60,320 are property of the estate, free of any interests of Wollesens or Litwillers.

IT IS FURTHER ORDERED that Claim Nos. 12, 21, 22 and 23 are disallowed.